UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GREATER NEW ORLEANS FAIR                    CIVIL ACTION
HOUSING ACTION CENTER, INC.

VERSUS                                      NO. 15-1320

JIM HOTARD AND 3839 ULLOA                   SECTION "R" (3)
STREET, L.L.C.


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**


I.    **INTRODUCTION**

This case arises from allegations of housing discrimination at an

apartment building located at 3839 Ulloa Street, in New Orleans, Louisiana.

The building is owned and operated by Defendants Jim Hotard and 3839

Ulloa Street, LLC.[1]   Plaintiff Greater New Orleans Fair Housing Action

Center, Inc., filed this lawsuit on April 23, 2015, asserting a claim under the

---

[1]    Hotard is the sole member of 3839 Ulloa Street, LLC.   For
simplicity, all references to "Hotard" or "defendant" refer to both defendants.

Fair Housing Act (FHA), 42 U.S.C. § 3601, *et seq.*[2] Plaintiff seeks declaratory and injunctive relief, damages, attorneys' fees, and costs.[3]

Plaintiff's complaint alleged that defendant Hotard treated potential renters for his property differently on the basis of their race. More specifically, plaintiff alleges that Hotard refused to respond to email inquiries regarding his property from African-American testers but responded promptly to email inquiries from white testers.[4] Further, plaintiff alleges that Hotard responded less favorably to phone inquiries from African- American testers than he did to phone inquiries from white testers.[5]

On July 17, 2017, the Court held a bench trial. The Court has jurisdiction over plaintiff's FHA claim under 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C. § 3613. After hearing live testimony and reviewing all the evidence, the Court rules as follows.

---

[2] R. Doc. 1. Plaintiff's complaint also asserted a claim under the Louisiana Equal Housing Opportunity Act, La. Rev. Stat. Ann. § 51:2601, *et seq.*, but the joint pre-trial order signed by the parties and approved by the Court makes no mention of any claim under Louisiana law. Because it is "a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial," the Court finds that plaintiff has abandoned its claim under the Louisiana Equal Housing Opportunity Act. *Vanhoy v. United States*, 514 F.3d 447, 450 n.10 (5th Cir. 2008) (quoting *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996)).

[3] R. Doc. 1 at 11-12.

[4] *Id.* at 4-6.

[5] *Id.* at 6-8.

## II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.   Background

Defendant James Hotard owns and manages property in the greater New Orleans area.[6]  At all times relevant to this lawsuit, Hotard owned three multifamily properties in the greater New Orleans area, located at 1434 St. Andrew Street, 2217 Lapeyrouse Street, and 3839 Ulloa Street.[7]  These buildings had 55 available units combined.[8]  Hotard manages and maintains all of his properties, as well as a 52-unit building on the West Bank that he does not own.  Hotard also has a small credit-card-processing service business.[9]

The property at issue is located at 3839 Ulloa Street, in Mid-City New Orleans.  The apartment building has 20 units, and at the time of the events relevant to this lawsuit, 17 of the 20 units were occupied by African-Americans.[10]  The Ulloa building, like all of Hotard's buildings, had many Section 8 tenants, as well as other tenants referred from various charities.[11]

---

[6]      Testimony of James Hotard.
[7]      *Id.*
[8]      *Id.*
[9]      *Id.*
[10]     *Id.*; Defs.' Ex. 3.
[11]     Testimony of Hotard.

The area where the property is located has undergone demographic changes over the last two decades. According to census data, since the year 2000, the proportion of African Americans to white residents has decreased.[12] Further, the specific block where the property is located has seen a significant decrease in African-American residents.[13]

The Greater New Orleans Fair Housing Action Center (GNOFHAC) is a private section 501(c)(3) nonprofit organization that works to end housing discrimination and segregation in Louisiana.[14] The organization focuses on four areas: enforcement (*i.e.*, bringing claims on behalf of individuals who have experienced housing discrimination), policy advocacy, education and outreach, and homeownership protection.[15]

One of the ways that GNOFHAC identifies housing discrimination is through testing.[16] Testing is an investigative tool commonly used by fair housing organizations to determine if landlords and others offering housing are discriminating or engaging in differential treatment.[17] GNOFHAC's Investigations Coordinator Michelle Morgan testified that GNOFHAC gives

---

[12]    Testimony of Cashauna Hill; Pl. Ex. 48.
[13]    *Id.*
[14]    Testimony of Hill. Despite its name, GNOFHAC has recently expanded its focus to the entire state of Louisiana. *Id.*
[15]    *Id.*
[16]    Testimony of Michelle Morgan.
[17]    *Id.*

4

paired testers "profiles" that include assigned information on the tester's income, education, work history, and other information relevant to housing.[18] The testers are equally qualified for the housing, and similar in all relevant characteristics except for the characteristic subject to testing.[19] For example, if testing for racial discrimination, the testers' profiles will match except for race. The testers record their interactions with landlords through audio-recording devices, and also provide written reports of their encounters.[20] GNOFHAC provides their testers with a training manual, in-class training exercises, and mock encounters.[21] Morgan testified that the testers are not told in advance what they are testing for, as to not bias or compromise the test.[22] The testers are compensated for their work.[23]

## B. The Tests, and GNOFHAC's Response

Morgan testified that in March of 2013, a Craigslist advertisement for two available units at Hotard's Ulloa Street property came to her attention.[24] Morgan was not sure how she came across the ad, and suggested that either

---

[18]     *Id.*

[19]     *Id.* Morgan testified that that the protected class tester will actually be slightly more qualified. For example, a black tester's profile may include a salary of $43,500 compared to $41,000 for the white tester. *Id.*

[20]     *Id.*

[21]     *Id.*; Pl. Ex. 14.

[22]     Testimony of Morgan.

[23]     *Id.*

[24]     *Id.*

a staff member referred it to her, or she came across it during her own search of new advertisements.[25] Morgan testified that the ad stuck out to her because it said "no Section 8" on it, and Morgan believed this was coded language suggesting that the units were not available to African Americans.[26] As the advertisement solicited email responses, Morgan decided to conduct an email test.[27]

Morgan reached out to Jesse Chanin and Denise Frazier, two previous testers with multiple years of experience conducting tests for GNOFHAC.[28] Jesse used the name "Jessy," and Denise used the name "Trynesse," which Morgan testified is an identifiably African-American name.[29] On March 11, 2013, the testers sent similarly worded emails to Hotard, both indicating an interest in the apartment and requesting further information to set up a viewing.[30] Hotard responded to Jessy with his phone number, but did not respond to Trynesse.[31] Based on the lack of response, Morgan decided to set up a second test to be conducted that same day.

---

[25]     *Id.* There is no evidence that GNOFHAC received a complaint about the advertisement from someone in the community.

[26]     *Id.*; Pl. Ex. 18.

[27]     Testimony of Morgan; Pl. Ex. 18.

[28]     Testimony of Morgan.

[29]     *Id.*

[30]     *Id.*; Pl. Ex. 19; Pl. Ex. 20.

[31]     Pl. Ex. 19; Pl. Ex. 21.

This time, instead of using actual testers, Morgan decided to create fake email addresses and email Hotard herself.[32]  Morgan used the names "Jahmal" and "Marzy," and when asked why she used those names, Morgan asserted that Jahmal is "identifiably African American."[33]  As with the first test, the emails sent to Hotard were similarly worded and both sought a time to view the apartment.[34]  Hotard responded to Marzy and offered to show her the apartment, but Hotard did not respond to Jahmal's email.[35]  Morgan then decided to set up a third email test.

For the third test, conducted on March 13, 2013, Morgan used the names "Demaria" and "Elizabeth."  Morgan testified that she felt "Demaria" was "identifiably African American" and that "Elizabeth" was "neutral."[36]  As with the first two tests, Hotard responded to Elizabeth's email but did not respond to Demaria's.[37]

On March 26, 2013, Hotard placed another ad for the same units on Craigslist, but this ad requested phone inquiries instead of emails.[38]  Morgan

---

[32]  Testimony of Morgan.

[33]  *Id.*  Morgan did not testify as to why she chose "Marzy," and it is not clear if Morgan felt that "Marzy" is "identifiably" white.  Morgan never explained her basis for her beliefs that these names are racially identifiable.

[34]  Pl. Ex. 23; Pl. Ex. 24.

[35]  Pl. Ex. 24; Pl. Ex. 25.

[36]  Testimony of Morgan.

[37]  *Id.*; Pl. Ex. 28; Pl. Ex. 30; Pl. Ex. 32.

[38]  Pl. Ex. 34.

testified that she wanted to continue testing, but because the advertisement changed to phone inquiries, Morgan switched to phone tests.[39]  For her first phone test, Morgan reached out to Herschel Williams and Alex Owen, two testers with experience testing for GNOFHAC.[40]  Morgan gave Herschel and Alex their testing profiles, and a contact number to call Hotard.  Herschel and Alex recorded their phone calls to Hotard, and the recordings were played for the Court.

On March 27, 2013, Herschel called Hotard's number listed on the ad. He reached Hotard's voicemail, which listed another number to contact if interested in apartment vacancies.[41]  After leaving a voicemail, Herschel proceeded to call that second number, and left a voicemail there as well.[42] While Herschel was on the phone, Hotard called him back, but did not leave a message.[43]  Herschel then tried Hotard again on both March 27 and 28, leaving multiple voicemails, and also texted him.[44]  Hotard never called Herschel back.

---

[39]  Testimony of Morgan.
[40]  *Id.*
[41]  Pl. Ex. 39A (recording).
[42]  Pl. Ex. 39B (recording).
[43]  Testimony of Morgan.
[44]  *Id.*; Pl. Ex. 39C-E (recordings).

Also on March 28, Alex called Hotard and left a voicemail. Hotard called Alex back shortly thereafter, and the two briefly discussed the apartment and set up a time for Alex to view the apartment on April 1.[45] Alex viewed the apartment with Hotard on April 1, and on April 4, Hotard called Alex again to see if he was still interested in the apartment.[46]

Morgan then set up the fifth and final test, to be conducted over April 4 and 5. Morgan picked Jahmal Clark and Matt Robinson for this test, two individuals with previous testing experience.[47] On April 4, Jahmal called Hotard on both numbers and left messages on both.[48] Shortly after, Hotard called Jahmal back, and the two discussed the unit and a possible visit.[49] Jahmal asked if he could see the apartment on the following day (April 5), and Hotard told him he would be out of town.[50] Hotard also said he was very busy that weekend, but that Monday would be a "great day.[51] Hotard told Jahmal to call back Monday morning to set up the viewing.[52]

---

[45] Pl. Ex. 39F-G (recordings).
[46] Testimony of Morgan; Pl. Ex. 37; Pl. Ex. 39J (recording).
[47] Testimony of Morgan.
[48] Pl. Ex. 39K, L.
[49] Pl. Ex. 39M.
[50] *Id.*
[51] *Id.*
[52] *Id.*

That following day at 2:50 p.m., the same day Hotard told Jahmal he would be out of town, Matt called Hotard.[53]  Hotard answered, and when Matt asked to see the apartment, Hotard told him to come by that day at 3:30 p.m.[54]  Matt then met Hotard at the apartment building and viewed the unit.[55]  On that following Monday, Jahmal called Hotard back and left a voicemail, but Hotard never called Jahmal back.[56]

Following this fifth test, Morgan felt that GNOFHAC had enough evidence to initiate a complaint.[57]  GNOFHAC also notified its Education and Outreach Department about the 3839 Ulloa tests so that the department could begin working to combat and counteract the perceived discrimination.[58]  Sophie Rosen, GNOFHAC's Education and Outreach Director at the time, testified that the Department explored various options to notify the residents of the neighborhood and potential tenants about housing discrimination from May through September 2013.[59]  The options included yard signs, mailers, and other informational posters.[60]  Rosen's

---

[53]    Pl. Ex. 39N.
[54]    *Id.*
[55]    Pl. Ex. 44.
[56]    Pl. Ex. 39P.
[57]    Testimony of Morgan.
[58]    Testimony of Sophie Rosen.
[59]    *Id.*
[60]    *Id.*

Department ultimately decided on mailers, and began the process of designing, ordering, and distributing the mailers.[61]

Rosen testified as to the cost of the mailers, both in terms of printing and shipping, and GNOFHAC introduced the receipts as evidence.[62] Rosen also testified as to the amount of hours spent working on combating the perceived discrimination at 3839 Ulloa Street.[63] Rosen further testified as to the other events that the Department was planning at the time, including Fair Housing Five, Fair Housing University, and Fit for King.[64] Because of the time and money spent on responding to the perceived discrimination at 3839 Ulloa Street, Rosen testified that her Department was unable to achieve their goals with the other events, and had to cancel one of the Fair Housing University courses.[65]

### C. Testimony of James Hotard

After the plaintiff rested, Hotard testified in his defense. Hotard began his testimony by discussing his work and family life. Hotard testified that he

---

[61] *Id.*

[62] *Id.*; Pl. Ex. 6; Pl. Ex. 7.

[63] Testimony of Rosen.

[64] *Id.* Fair Housing Five is a youth initiative to educate young people about housing discrimination, Fair Housing University focuses on adult education and includes courses on topics such as mortgages, foreclosure scams, disaster prevention, etc., and Fit for King is GNOFHAC's annual civil rights conference. *Id.*

[65] *Id.*

has eight biological children and that his family also adopted another child.[66] He also testified that the majority of his days are spent addressing the various maintenance needs that arise at his properties, and that he does not have any employees to assist him.[67] He further testified that in addition to his work and family life, he is a part-time rugby coach and is involved in the Boys Hope Girls Hope organization.[68]

Hotard also testified as to how he attracts tenants for his various properties. Hotard said he relies on word-of-mouth communication from his tenants, advertisements in the classifieds in the *Times-Picayune*, the availability list with the Housing Authority of New Orleans (HANO), social workers who refer potential tenants, and charities like the Star Corporation, Responsibility House, Unity, and Volunteers of America that make referrals to Hotard.[69] Many of Hotard's tenants come through the Section 8 program, which is administered by HANO.[70] And while Hotard testified that he generally had a good experience leasing to tenants through HANO, HANO's bureaucracy can cause delays, and he said it sometimes takes up to two months from filling out the HANO paperwork until the tenant can actually

---

[66] Testimony of Hotard.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*

move in and begin paying rent.[71]  For non-Section 8 tenants, the time between seeing the apartment and moving in can be as little as a day or two.[72] Hotard also testified that he had some payment issues with HANO, and working with HANO can mean he loses a "whole month's worth of rent."[73] Further, unlike some of the other organizations that refer tenants to him, HANO does not have social workers who can help if any problems arise with a tenant.[74]

In March of 2013, Hotard decided to place an advertisement online through Craigslist for two vacant units at the 3839 Ulloa Street property. Hotard had never used Craigslist for his properties before, but decided to do so because it was free, and Hotard thought it might help him get some tenants who were not Section 8 tenants connected with HANO.[75]  Hotard testified that he wanted to recruit non-HANO tenants because of the payment issues he had experienced.[76]

Hotard testified that he got "a lot" of email responses, and that it was "just cuckoo."[77]  He responded to the emails on his iPhone, and responded to

---

[71]    *Id.*
[72]    *Id.*
[73]    *Id.*
[74]    *Id.*
[75]    *Id.*
[76]    *Id.*
[77]    *Id.*

13

whatever email was most recent if he had an opportunity to look at his phone. But he testified emphatically that his decision whether to respond had nothing to do with the name of the person who sent the email. He also testified that he did not know the race of any of the individuals who emailed him about the apartment.[78]

Hotard testified that when he responded to the emails, he did not get many follow-ups. He therefore decided to put up a new ad, but with his phone number listed instead.[79] He regretted the change, however, because he got "overwhelmed with phone calls." Hotard also introduced his phone records from this time period as evidence, and the records indicated that he indeed did receive a large number of phone calls each day during the time the ad was listed, and received over 100 phone calls a day more than once.[80] Indeed, the phone records showed that Hotard's cell phone received 3,588 phone calls from March 10, 2013 through May 10, 2013.[81] He said he did his best to return all of the calls, and that he had no "method" or "rhyme or reason" for trying to determine which calls to return.[82] He also testified that a person's race had no effect on his decision to return a call, and that he

---

[78] *Id.*

[79] *Id.*

[80] Testimony of Hotard; Testimony of Morgan; Pl. Ex. 65.

[81] Pl. Ex. 65.

[82] Testimony of Hotard.

returns the phone calls of African-Americans.[83]  He testified specifically that while he did not remember getting the calls from Herschel and Jahmal, he would not have made any determination of a caller's race based solely on their voices.[84]  Further, when asked by plaintiff's counsel if he "recognize[d] Herschel as being African American when he called," Hotard answered "no."[85]

Finally, Hotard testified that race never plays a role in his decision of whether to rent to someone.  He testified that of his 55 units in 2013, 49 were rented to African-Americans.[86]  Further, he testified that in April of 2013 he began working with an African-American Section 8 tenant, Ronald Leblanc, to rent one of the two available Ulloa Street units.[87]  Hotard testified that the charity group Volunteers of America referred Leblanc to Hotard.  Hotard further testified that he called Leblanc, drove to pick him up at a drug rehabilitation facility, and then showed him the apartment.[88]  On May 9, 2013, Leblanc signed his lease and moved in.[89]

---

[83]     *Id.*
[84]     *Id.*
[85]     *Id.*
[86]     *Id.*
[87]     *Id.*; Defs'. Ex. 4; Defs'. Ex. 5.
[88]     Testimony of Hotard.
[89]     Defs'. Ex. 5.

Hotard testified that Leblanc did not stay in the unit for long, however, because Leblanc began using drugs again.[90]  Hotard testified that Leblanc had many visitors, including some who would throw rocks at his window to the point where the window broke.[91]  Hotard further testified that the troubles continued until one day Hotard got a phone call from the police telling him that Leblanc was found in his apartment bleeding, with his throat cut.[92]  Leblanc never came back to the unit.[93]

After Hotard cleaned the unit and changed the locks, Hotard rented the unit to Ms. Ada Golson, an African-American.[94]  Hotard testified that Golson called him to inquire about the unit.  When Golson told Hotard that she needed a ride to view the apartment, Hotard drove to pick her up.[95]  Golson loved the apartment, and Hotard and Golson began to fill out the HANO paperwork so that Golson could move in.[96]

Ms. Golson corroborated Hotard's testimony.  She testified that she moved in to the unit at 3839 Ulloa Street in August of 2013.  She further testified that when she called Hotard in late July to inquire about the unit,

---

[90]    Testimony of Hotard.
[91]    *Id.*
[92]    *Id.*
[93]    *Id.*
[94]    *Id.*
[95]    *Id.*
[96]    *Id.*

he told her about the unit at Ulloa Street as well as another vacant unit in one of his other properties.[97]  She said that Hotard came and picked her up at work, took her to both properties, and then went to HANO himself to help her with the paperwork necessary for her to move in.[98]

Plaintiff introduced no evidence at trial showing that Hotard actually knew the race of any of the testers who emailed or called him.

### C.    Standing

Defendants' proposed findings of fact and conclusions of law argue that plaintiff has not suffered any injury as a result of Hotard's actions, and therefore plaintiff lacks standing to pursue its claims.[99]  As standing implicates the Court's jurisdiction to resolve this dispute, the Court must determine as a threshold matter whether plaintiff has standing.

The "Supreme Court has held that the sole requirement for standing under the FHA is the Article III minima." *Lincoln v. Case*, 340 F.3d 283, 289 (5th Cir. 2003) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982).  Article III standing consists of three elements: (1) the plaintiff must have suffered an "injury-in-fact," which is an "actual or imminent" invasion of a legally protected interest that is "concrete and particularized"; (2) the

---

[97]     Testimony of Ada Golson.

[98]     *Id.*

[99]     R. Doc. 40 at 5.

17

injury must be "fairly traceable" to the challenged conduct of the defendant; and (3) it must be likely that plaintiff's injury will be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing each element. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The Fair Housing Act provides a private right of action to any "aggrieved person," including corporations, partnerships, organizations, and associations. 42 U.S.C. § 3613(a)(1)(A). Any person who "claims to have been injured by a discriminatory housing practice" is an "aggrieved person." *Id.* § 3602(i). Fair housing organizations such as plaintiff suffer injury when discriminatory housing practices frustrate the organizations' mission and force them to "divert significant resources to counteract the defendant's conduct." *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (citing *Havens*, 455 U.S. at 379). The Supreme Court has held that this "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources," is sufficient to grant Article III standing. *Havens*, 455 U.S. at 379.

Plaintiff's testimony and evidence indicates that, as a result of what it perceived to be discriminatory housing practices by Hotard, it diverted

resources to counteract those practices. Morgan testified that she spent nearly 15 hours coordinating and supervising the tests, as well as reviewing and analyzing the results.[100] She also testified that she paid the testers for their work.[101] Further, Rosen testified as to the time and resources her staff spent in distributing an informational flyer on race-based discrimination in the area of Hotard's building to combat housing discrimination.[102] Finally, Rosen testified that the time and resources spent on investigating and counteracting Hotard were diverted from other planned projects, like the Fair Housing University courses and the Fit for King Conference.[103]

The testimony offered by plaintiff's witnesses was not speculative or unsupported by proof. On the contrary, plaintiff introduced exhibits detailing the financial and time costs it incurred. This included time and money spent preparing tests, training the testers, monitoring the testers and the results of the tests, and paying the testers for their work. This time and money would have been spent on other activities consistent with plaintiff's mission were it not for Hotard's actions. Further, if plaintiff succeeds on its challenge, it will obtain not only resources to compensate it for the money it

---

[100] Testimony of Morgan; Pl. Ex. 47.
[101] Testimony of Morgan; Pl. Ex. 49.
[102] Testimony of Rosen; Pl. Ex. 5; Pl. Ex. 6; Pl. Ex. 7.
[103] Testimony of Rosen.

spent but can also obtain injunctive relief which will further its mission.

Based on this evidence, the Court finds that plaintiff has demonstrated an injury-in-fact, fairly traceable to defendant's conduct, and that this injury is likely to be redressed by a favorable judicial decision. Accordingly, the Court finds that plaintiff has standing to pursue its claims. *See Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 495-497 (N.D. Tex. 2012) (finding that fair housing organization has standing based on diversion of time and resources); *Banks v. Hous. Auth. of City of Bossier City, La.,* No. 11-0551, 2011 WL 4591899, at *4 (W.D. La. Sept. 30, 2011) (finding that GNOFHAC had organizational standing at motion to dismiss stage based on diversion of resources); *cf. Louisiana Acorn Fair Hous. Org. v. Ramada Vacation Suites*, No. 00-624, 2001 WL 725309, at *4 (E.D.La. June 25, 2001) (holding that there was no standing where organization relied on "conjectural and hypothetical" testimony without specifics or evidence to show diversion of resources).

### D.  The Fair Housing Act

The Fair Housing Act "prohibits discrimination in the provision of housing," *Artisan/American Corp. v. City of Alvin, Tex.*, 588 F.3d 291, 295 (5th Cir. 2009), and expressly prohibits the refusal to "sell or rent after the

making of a bona fide offer,[104] or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color religion, sex, familiar status, or national origin." 42 U.S.C. § 3604(a). A claim under the FHA may be established with proof of discriminatory treatment, or proof of a significant discriminatory effect (also known as disparate impact). *Artisan/American*, 588 F.3d at 295; *Simms v. First Gibralter Bank*, 83 F.3d 1546, 1554 (5th Cir. 1996). Plaintiff does not bring a disparate impact claim.[105] With discriminatory treatment claims, there can be no liability without a finding that the protected trait (*i.e.*, race) motivated the challenged action. *Simms*, 83 F.3d at 1556; *Woods-Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir. 1982) ("Plaintiff need only prove that race was one significant factor in defendant's dealings with them in order to

---

[104] Liability under section 3604(a) does not always require a bona fide offer, as efforts to make housing unavailable, such as a refusal to negotiate, can make it impossible for a prospective buyer to ever make an offer. *See Grant v. Smith*, 574 F.2d 252, 255 (5th Cir. 1978) ("To require a bona fide offer in such circumstances could render these protective provisions of section 3604 meaningless.").

[105] Although plaintiff's proposed findings of fact and conclusions of law refer generally to the demographics of the area where the property at issue is located, they submit no statistical evidence to suggest that *Hotard's* practices or conduct have had a significant discriminatory effect on African-Americans in the area at large. Accordingly, the Court finds that plaintiff is not bringing a discriminatory effect (or disparate impact) claim. *See generally Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) (discussing disparate impact FHA claims).

establish a violation of the Fair Housing Act.") (collecting cases); *see also Miller v. Towne Oaks East Apts.*, 797 F. Supp. 557, 561 (E.D. Tex. 1992) (after bench trial, noting that plaintiff must "prove that race was one significant factor in defendant's dealings with him" to succeed on his Fair Housing Act claim).

As described above, plaintiff conducted five paired tests on Hotard's available apartments, three by email and two by phone. Plaintiff's proposed findings of fact and conclusions of law argue that Hotard made his units unavailable to the African-American testers because of their race.[106]  In support, plaintiff points to Hotard's failure to respond to emails from African-American testers while responding to emails from white testers, as well as his differential treatment of the African-American testers' phone inquiries compared with the white testers' inquiries.

Plaintiff has not introduced any direct evidence of intentional race-based discrimination towards the testers.[107]  And although the test results did show differential responses, plaintiff has failed to establish by a preponderance of the evidence that Hotard knew the race of the African-

---

[106]    R. Doc. 43 at 18.
[107]    Direct evidence as relevant here would be evidence "which, if believed, proves" that race was a motivating factor in Hotard's decision "without inference or presumption." *See, e.g., Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citations omitted).

American testers.[108]  This is fatal to plaintiff's Fair Housing Act claim.  The

clear language of section 3604(a) prohibits the refusal "to negotiate for the

sale or rental of, or otherwise make unavailable or deny, a dwelling to any

person *because* of race."  42 U.S.C. § 3604(a) (emphasis added).  As

explained above, while plaintiffs need not establish that housing decisions

were made solely on the basis of race, they must show that race was a factor.

*See, e.g.*, *Artisan/American*, 588 F.3d at 295.  A plaintiff cannot make this

showing if the decisionmaker was unaware of the potential renter's race.

Although the Fifth Circuit has never explicitly held that there can be no

Fair Housing Act violation when the defendant is unaware of the plaintiff's

status as a member of a protected class, this conclusion is clear from the text

of section 3604(a), as well as Fifth Circuit caselaw requiring proof that race

was a factor in the adverse decision.  Common sense supports this conclusion

as well: one cannot discriminate against someone on the basis of that

person's race if the alleged discriminator does not know the race of that

---

[108]    Because this case culminated in a bench trial, the Court need not
address the *McDonnell Douglas* burden-shifting framework.  The Fifth
Circuit has repeatedly explained that the *McDonnell Douglas* analysis is
"applicable only in a directed verdict or a summary judgment situation, and
is not the proper vehicle for evaluating a case that has been fully tried on the
merits."  *Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d 568, 575 (5th
Cir. 2004) (internal quotation marks omitted) (quoting *Powell v. Rockwell
Int'l Corp.*, 788 F.2d 279, 285 (5th Cir. 1986)); *see also Inclusive
Communities Project*, 860 F. Supp. 2d at 318-19.

person.

This conclusion is also consistent with a multitude of cases addressing Fair Housing Act claims against defendants who claimed to be unaware of the plaintiff's race at the time of the challenged action. For example, in *Mitchell v. Shane*, the Second Circuit affirmed the judgment in favor of defendants accused of a Fair Housing Act violation because there was "no evidence that the [defendants] had any knowledge of the [plaintiffs'] racial background until after the [defendants] had rejected the [plaintiffs'] offer." 350 F.3d 39, 49 (2d Cir. 2003); *see also Banks v. Prudential California Realty*, 15 F.3d 1082, 1994 WL 6572, at *4 (9th Cir. 1994) (affirming jury instruction in Fair Housing case that required finding that defendant knew plaintiffs' race at the time defendant made housing decision); *Hamilton v. Svatik*, 779 F.2d 383, 387 (7th Cir. 1985) (stating that defendant's awareness of plaintiff's race is necessary to establish a prima facie case under the Fair Housing Act); *Fincher v. South Bend Housing Authority*, 612 F. Supp. 2d 1009, 1025 (N.D. Ind. 2009) (granting summary judgment for defendant in Fair Housing Act case because plaintiff "fails to state that the [defendant] was aware of his membership in a protected class, let alone provide evidence to demonstrate that fact"); *Sherry v. Coldwell Banker Preferred-Canton*, N0. 07-13648, 2008 WL 3876351, at *6 (E.D. Mich. Aug. 18, 2008) (granting

summary judgment for defendants on Fair Housing Act racial discrimination claim because "plaintiffs have failed to produce any evidence whatsoever that any of the defendants . . . had any awareness, or any possible way of being aware, of their race").[109]

The Court finds Hotard's testimony that he did not know the race of the testers that contacted him to be credible, especially because it is uncontested that he never saw any of the African-American testers. Plaintiff seeks a finding from the Court that Hotard knew the race of the African-American email testers based solely on their names, and knew the race of the phone testers based solely on their voices. But even assuming that awareness of a name and voice alone could establish one's knowledge of another's race, the Court finds that plaintiff has failed to show that *Hotard* knew the tester's

---

[109]    It is also consistent with cases arising under other anti-discrimination statutes, including cases within the Fifth Circuit. *See, e.g.*, *Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002) ("[A]n employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion.") (citations omitted); *Clay. Holy Cross Hospital*, 253 F.3d 1000, 1007 (7th Cir. 2001) (no claim for pregnancy-based discrimination when decision-maker did not know plaintiff was pregnant); *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) ("An employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race."); Phillips *v. TXU Corp.*, No. 05-1588, 2006 WL 3900112, at *6 (N.D. Tex. Dec. 29, 2006) ("[Plaintiff's] discrimination claims cannot survive summary judgment if she cannot show that the decisionmakers on her application were aware of her race.").

races based on their names and voices in this case. Plaintiff provides no expert testimony to support its contention, even though expert testimony is typically used to prove linguistic profiling or that race is identifiable by a person's name. *See, e.g.*, *U.S. E.E.O.C. v. Target Corp.*, 460 F.3d 946, 961-62 (7th Cir. 2006) (noting that EEOC "presented expert testimony indicating that some people can determine a speaker's race based on his or her voice or name"); *United States v. Bostic*, 713 F.2d 401, 404 (8th Cir. 1983) (noting that witness's testimony that he identified defendant's race based on defendant's voice should be viewed with "circumspection" because the witness was not a linguistic expert); *United States v. Housing Authority of City of Chickasaw*, 504 F. Supp. 716, 725-26 (S.D. Ala. 1980) (finding study not reliable because no evidence established qualifications of pollsters to identify race of person on the basis of person's voice); *see also* Michael Erard, *Language Matters*, 5 J. L. & Soc. CHALLENGES 225, 225 (2003) (discussing use of linguistic profiling expert testimony in housing discrimination cases); Dawn L. Smalls, *Linguistic Profiling and the Law*, 15 STAN. L. & POL'Y REV. 579, 586-87 (2004) (same); Audrey J. Lee, *Unconscious Bias Theory in Employment Discrimination Litigation*, 40 HARV. C.R.-C.L. L. REV. 481, 493-500 (2005) (discussing role of expert testimony in discrimination cases based on implicit bias towards names and voices).

Further, other courts in similar discrimination cases have cast doubts on these evidentiary arguments. *See Bafford v. Township Apartments Assocs.*, No. 06-657, 2007 WL 4247763, at *5 (M.D. Fla. Nov. 30, 2007) (stating that plaintiff's "speculation" that defendant's real estate broker knew plaintiff's race based solely on their telephone conversations was "insufficient to impute knowledge of his race to" the real estate broker); *see also Wharton v. Knefel*, 562 F.2d 550, 552 n.9 (8th Cir. 1977) (noting that district court expressed that "there isn't a way in the world that this Court at least could ascertain by his voice what his race was"); *City of Chickasaw*, 504 F. Supp. 716, 725-26 (S.D. Ala. 1980).

The Court also finds Hotard's testimony that an individual's name would not affect his decision to respond to an email or return a call to be credible. It is undisputed that the vast majority of Hotard's units have been rented to African-Americans, and Hotard's and Golson's testimony make clear that Hotard has, in more than one instance, gone out of his way to accommodate potential African-American tenants and work with them to fill out the necessary paperwork so that they can move into his units. Hotard's willingness to pick up these potential tenants and take time to help them with paperwork is inconsistent with a landlord who refuses to negotiate with potential tenants because they are African-American. Further, Hotard

credibly explained that his ads' reference to "no Section 8" was not coded racial language, but based on Hotard's desire to avoid HANO's bureaucracy (and the associated delays), as well as previous payment issues with HANO that Hotard experienced.

Finally, the Court finds Hotard's testimony that he did his best to return every phone call, and that there was no rhyme or reason to his decision whether to call an individual back or respond to an email, to be credible. As both Hotard's testimony and his phone records show, Hotard was "overwhelmed" by the responses, and anyone would be hard pressed to answer or return 100 or more phone calls in one day. That some phone calls went unanswered, in the context of a 100-call day, does not suggest an unwillingness to negotiate, nor does it suggest that Hotard's testimony should be viewed as suspect.

Plaintiff bears the burden of establishing that race was a factor in the challenged decision. In light of Hotard's testimony that he was not aware of the African-American testers' races during his dealings with them, and plaintiff's failure to present evidence to the contrary, the Court finds that plaintiff has not shown that Hotard knew the African-American testers' races. Accordingly, plaintiff has failed to establish that race was a factor in Hotard's decisions. *A fortiori*, plaintiff has failed to establish that Hotard

discriminated against the testers on the basis of race.

### E.    Punitive Damages

The Court's finding that Hotard did not discriminate on the basis of race precludes any liability, so accordingly Hotard cannot be liable for punitive damages.  In any event, even if the Court were to find that Hotard did discriminate on the basis of race, the Court would not award punitive damages.  In Fair Housing Act cases, "if the court finds that a discriminatory housing practice has occurred . . . the court may award to the plaintiff actual and punitive damages."  42 U.S.C. § 3613(c)(1).  In the Fifth Circuit, the standard for punitive damages in Fair Housing Act cases is "whether the defendant acted with malice or reckless indifference that his actions might violate a federal statute of which he was aware."  *Lincoln*, 340 F.3d at 291 (internal modifications and citation omitted).  There is no evidence whatsoever that Hotard acted with malice towards any of the testers he encountered, and none of the evidence or testimony introduced at trial support a finding that Hotard acted with reckless indifference.[110] Additionally, the facts of this case are far less egregious than another Fair

---

[110]    It is also not clear that Hotard was aware of his obligations under the Fair Housing Act.  Although Hotard's awareness of his obligations under the Act is listed as an uncontested fact in the joint pretrial order, Hotard testified at trial that he lacks basic familiarity with Landlord-Tenant law and has never been trained on the subject.  Testimony of Hotard.

Housing case within the Fifth Circuit, and that court did not find that punitive damages were justified. *Cf. United States v. Collier*, No. 08-686, 2010 WL 3881381, at *5-6, 10-14 (W.D. La. Sept. 28, 2010) (finding punitive damages not warranted despite evidence of defendant's frequent usage of racial slurs, as well as defendant's "disingenuous scheme . . . to exclude blacks" from his property); *see also Miller*, 797 F. Supp. at 562. Accordingly, to the extent that Hotard could be liable under the Fair Housing Act at all, he is not liable for punitive damages.

## III. CONCLUSION

Because plaintiff has failed to establish by a preponderance of the evidence that defendant discriminated against its testers on the basis of their race, the Court finds that defendants are not liable to plaintiff. According, the Court renders judgment in favor of defendants.

New Orleans, Louisiana, this ___7th___ day of August, 2017.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE